# CHARLESTOWN.

## CHESAPEAKE & OHIO R. R. CO. *v.* ROBERT PATTON ET AL.

### October 31, 1876.

1876.
August Term.

1. The thirty-seventh section of chapter 88, of the acts of 1872–73, requires all railroad companies who, when this law was passed, April 3, 1873, were constructing their roads, if they desired to acquire title to lands, to proceed in the manner prescribed by the eighteenth section of such act, and, after the passage of this act, such a railroad, though incorporated before this act passed, can not condemn lands in the manner prescribed by the Code of West Virginia.

2. The title of this act, which is "An act to provide for the incorporation of associations that may be organized for the purpose of constructing railroads, maintaining and operating the same; for prescribing and defining the duties, and limiting the powers of such corporations when so organized," sufficiently indicates, that provisions in the act apply to these existing railroad corporations, and, therefore, said thirty-seventh section of this act, is not unconstitutional, the act not embracing more than one object, the regulation of *all* railroad corporations, and that object being sufficiently expressed in the title.

3. Though a railroad company had instituted proceedings, under the Code of West Virginia, to condemn land, and had taken possession of the land under the provisions of the twentieth section of chapter 42 of the Code, yet the land owner, or the railroad company, either, have a right, in the manner prescribed by the eighteenth section of this act, to require that the compensation to be paid, shall be ascertained by an impartial jury of twelve freeholders.

4. In proceedings under this act, the record states that the land owner moved to have a jury of twelve freeholders, which motion the

court sustained, being of opinion that he was entitled to such jury, and ordered a jury to be empanelled; no objection was made to the empanelling of the jury, because they were not freeholders. —HELD:

1876.
August Term.

C. & O. R. R.
v.
Patton.

In such a case, the Appellate Court will presume that all the jurors were freeholders, though it be not so stated expressly on the record.

5. In such a case, an affidavit made after the rendition of the verdict, that a portion of the jury were not freeholders, is not a good ground for setting aside the verdict.

6. An affidavit by a juror that a verdict was arrived at by each juror setting down the amount he regarded as just, and aggregating them, and then dividing by twelve, it having been agreed that the amount so ascertained should be the verdict, ought not to be received or considered on a motion for a new trial.

7. The proper time for allowing a credit for the amount paid into court by the plaintiff, in a proceeding to condemn lands, is when it is paid to the defendant, and not before its actual receip. by him.

*Supersedeas* to judgments of the circuit court of Kanawha county, entered on the twenty-fourth of November, 1873, the sixth of December, 1873, and the sixteenth of December, 1873, respectively, in a cause therein pending, in which the Chesapeake & Ohio Railroad was plaintiff, and Robert Patton and others were defendants.

The facts of the case sufficiently appear in the opinion of the court.

. Hon. Joseph Smith, Judge of said circuit court, presiding at the trials below.

*W. A. Quarrier* and *W. H. Hogeman*, for said Railroad Company, plaintiff in error.

*J. M. Laidley*, for defendant in error.

GREEN, JUDGE.

Proceedings were instituted in this case in the circuit court of Kanawha county, in 1870, by the Chesapeake & Ohio Railroad Company, under the provisions of chapter forty-two of the Code of West Virginia, to ascertain what would be a just compensation for certain real estate of Robert Patton, proposed to be taken for their use.

82

The commissioners, who had, theretofore, been appointed, reported on September 14, 1870, that $675 and the construction and keeping in repair, by the Railroad Company, of a certain fence and crossings, ways and cattle guards, would be a just compensation for so much of his real estate as was proposed to be taken. Patton excepted, but his exceptions were overruled, and the report confirmed, and ordered to be recorded. Patton, thereupon, appealed, and this Court, on February 22, 1873, reversed this action of the circuit court, and remanded the cause to the circuit court for further proceeding, for the reasons set forth in its opinion. See *Chesapeake & Ohio Railroad Company v. Patton*, 6 W. V., 143: While this case was formerly pending in this Court, the new Constitution of West Virginia was adopted, the ninth section of the third article of which, provides that " When private property shall be taken for the use of any company, incorporated for the purpose of internal improvement, the compensation of the owner shall be ascertained in such manner as shall be prescribed by general law ; provided, that, when required by either party, such compensation shall be ascertained by an impartial jury of twelve freeholders." On April 3, 1873, the legislature passed an act, taking effect from its passage, entitled "An act to provide for the incorporation of associations that may be organized for the purpose of constructing railroads, maintaining and operating the same ; for prescribing and defining the duties, and limiting the powers of such corporations when so organized." Acts of 1872–73, chapter eighty-eight, page two hundred and thirteen. The eighteenth section of this act, provides how such corporations may acquire real estate, for certain purposes, and among other things, it provides, "But if exceptions be taken and filed to the report of the viewers, and, when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders, selected according to law, the cause or proceeding, shall be tried as any other cause in said court, the jury, by their verdict, shall

ascertain and determine the amount to be paid by the railroad corporation for the land actually taken and no more; and the damages to the residue of the tract, if any, may be off set, and compensated for, by any peculiar benefit to said residue, which may arise by reason of the construction of said railroad, or any work necessary for the running and operation of the same." And the thirty-seventh section of this act provides, that "All existing railroad corporations within this State, shall, respectively, have and possess, all the powers and privileges, and be subject to all the duties, and liabilities and provisions contained in this act; and railroad companies that are now constructing their roads, may acquire title to land, necessary for that purpose, under the provisions of this act." And the forty-second section provides, "All general laws of this State in relation to railroad corporations, and the powers and duties thereof, so far as the same are not inconsistent with the provisions of this act, shall remain in force, and be applicable to railroad corporations organized under this act."

After the remanding of this case to the circuit court that court on May 14, 1873, appointed five freeholders as commissioners, in the manner prescribed by the tenth and eleventh sections of chapter forty-two of code of West Virginia. On August twenty-third, 1873, the commissioners reported that $900 was a just compensation for the quantity of land actually taken by the Chesapeake & Ohio Railroad Company. The defendant filed exceptions to this report, and, in them, required that the compensation to which he was entitled should be ascertained by an impartial jury of twelve freeholders, in pursuance of the constitution and laws of West Virginia, and, on November 24, 1873, he moved the court to have a jury empanelled to ascertain the damages to which he was entitled under the constitution, and as prescribed by section eighteen of chapter eighty-eight of the acts of 1872–73. The plaintiff objected to this motion, but the court decided that a jury should be empanelled, at the

bar of the court, to ascertain and return what sum will be just and equitable compensation to the defendant for the land taken by the plaintiff, and described in the proceedings. And on December 6, 1873, the jury was elected, tried, and sworn, to assess the defendant's damages, (the plaintiff objecting to their being empanneled). This jury, by their verdict, ascertained and determined the amount to be paid by the Chesapeake & Ohio Railroad Company to Robert Patton for the strip of land described in the proceedings, to be $2,149.55½. The plaintiff moved to set aside this verdict, which motion the court overruled, and rendered a judgment for the defendant, against the plaintiff, for $2,149.55½, with interest thereon from December 6, 1873, till paid, and costs.

The motion for a new trial was based on two affidavits, one by a juror, who stated that, when the jury was out, it was ascertained that there was a considerable difference of opinion among the jurors as to the value of the land, and it was then agreed that each juror should put down the amount he regarded as the true value; that the aggregate of these amounts should be divided by twelve, which was to be the value fixed by the jury. The amount of the verdict was ascertained in this manner. The price of the land put down by the different jurors varied from $100 per acre to $470 per acre. The other was an affidavit by plaintiff's counsel, that seven of the jurors were not freeholders. From this judgment of the circuit court, refusing to grant a new trial, and entering up a judgment according to the verdict of the jury, the plaintiff appealed to this Court.

*The first error assigned* is, that it was error to grant defendant's motion for a jury, after the commissioners, who had been appointed, had acted. The motion was founded on the paragraph in section eighteen, chapter eighty-eight of acts of 1872–73, which is quoted above. It is insisted that neither this section, nor any part of this chapter, has any application to railroads existing, or

in course of construction, when that act was enacted, April 3, 1873. It seems to me obvious that this section has application to all railroads, whether then existing, or afterwards to be incorporated. The object of the thirty-seventh section, above quoted, was to declare that existing railroads should be subject to all the provisions contained in this act. But this thirty-seventh section declares that, " all railroads that are now constructing their works, *may* acquire title to lands necessary for that purpose under the provisions of this act." And it is insisted, that the use of the word *may*, shows that the legislature designed to leave it optional with railroad companies, who were then constructing their roads, if they chose, to adopt the manner prescribed by the eighteenth section, or to adopt the mode prescribed by the forty-second chapter of the code of West Virginia, in which no jury was allowed. The only option given to the railroad companies by this thirty-seventh section was, to acquire, or not, as they pleased, title to the land. If they chose to acquire the title, they could only do so in the manner prescribed by the eighteenth section. That section uses the same language, "*may* acquire such *title*," as the act uses when declaring how railroad companies, incorporated under that act, are to proceed in condemning lands. It is a power conferred on these corporations, and the statute, properly, in reference to corporations existing, as well as those thereafter incorporated, says they *may* acquire title to lands. But there is, obviously, no distinction as to the mode in which the title is to be acquired by existing railroads, and by those thereafter incorporated. The thirty-seventh section, in express terms, declares that all the provisions of that act shall apply to existing corporations, and many other sections of this act, on their very face, show that they were intended to apply to all railroad corporations, and were not intended to be confined to railroad companies thereafter incorporated. As examples of such sections, I would refer to the twenty-second, twenty-third, twenty-seventh, thirty-

first, thirty-third, fortieth, and forty-first.

It is further insisted, that if the defendant had a right to require a jury to ascertain his compensation, that he waived this right, when, on the fourteenth of May, 1873, he participated in the appointment of commissioners, that if he wanted a jury, he should have then asked it, and he had no right to take the chances of a favorable report from the viewers, and, if unfavorable, to ask them for a jury. The eighteenth section of said act is a full answer to these positions. It's language is: " But, if exception be filed to the report, and when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders, selected according to law." Under this provision, it is obvious that the defendant had no right to ask a jury till, after the return of the report, and till after he had excepted thereto. Nor is there in this the unfair advantage which the argument of appellant's counsel imagines. For the same privilege is given the railroad company of asking a jury, after the return of the report of the viewers. The law seemed to have contemplated that a jury ought not to be allowed to either party till this report is made, as such report might be satisfactory to both parties, and thus the necessity of a jury trial be avoided.

But, admitting that this act of the legislature in this case, was intended to give the parties a right to a jury, it is insisted that, so far as the legislature extended this right to existing corporations, the act was unconstitutional. The thirtieth section of article 6 of the State Constitution provides, that, "no act hereafter passed, shall embrace more than one object, and that shall be expressed in the title. But if any object shall be embraced in an act, which is not so expressed, the act shall be void only as to so much thereof." The title of the act, above quoted, is read by the appellant's counsel as though it were worded thus: "An act to provide for the incorporation of railroad companies hereafter, and for prescribing and defining the duties, and limiting the powers

of railroad companies hereafter incorporated." If this
is the meaning of the title of this act, it would be clearly unconstitutional, so far as any of its provisions were to be applied to then existing railroad corporations; for the object of the act as thus expressed in the title, would have been to have made regulations solely with reference to companies to be incorporated in the future; and this as we have seen, would not have expressed the real objects of the acts, as indicated by the thirty-seventh section. But must we give this meaning to the title of this act? The title is, unquestionably, badly drawn, and there is much difficulty in ascertaining its meaning. The authorities sustain the position that "in considering whether an act of the legislature is repugnant to said thirteenth section of the sixth article of our State Constitution, the said section must be construed liberally in favor of the act; that it is the duty of the courts, in considering whether the object of the act is expressed in the title, to lean in favor of sustaining the validity of the act, and to declare its validity, unless its unconstitutionality is established, and made manifest and clear, beyond all reasonable doubt. It is the general object of the act, of which this section of the Constitution speaks. If this section of the Constitution were to receive from the courts a strict technical construction, it is manifest, that enormous evil and injury would result. Many of the most important acts of legislation,—acts involving rights of property, &c.—would be stricken down by the courts. The enormous evils that would result from such a construction would far overbalance any good to be derived therefrom. A most liberal construction of the section in favor of acts of the legislature, will secure the general objects and purposes of the provision in the Constitution, and any other construction would be disastrous in the extreme." *John Slack, Sr., and others v. John J. Jacob and others*, 8 West Virginia, 648, and cases cited. *Walker v. Caldwell*, 4 La., An. 298; *People v. Mahany*, 13 Mich., 494; *State v. County Judge of Davis County*, 2 Iowa,

282; *Shields and Preston v. Bennett, Auditor,* 8 W. Va. 74; *Johnson v. Higgins,* 3 Metc. (Ky.) 566. In the matter of the petition of Ferdinand Mayor, 60 N. Y., 504, *The People ex. rel. The City of Rochester v. Martin Briggs,* 50 N. Y. 553; *O'Larey v. Cook Co.,* 28 Ill., 534; *Blood v. Marcelliot,* 53 Pa., St. 391; *Thompasson v. The State,* 15 Ind., 455; *Chiles v. Drake,* 2 Met. (Ky.) 150; *Parkinson v. TheState of Maryland,* 14 Md. 185; *Inkster v. Carver,* 16 Mich. 488; *Mills v. Charleton,* 29 Wis. 400, 9 Am. Rep. 578; *City of St. Louis v. Tiefel,* 42 Mo. 578; Cooley's Cons. Lim., 3 edition, pages 142 to 147, and pages 166 and 167; Sedg. on Consti. and Stat Law, 2 ed., Pomroy's notes 520, 521, 522. Applying this rule of interpretation, what meaning should be attached to the second clause of the title of this act, that is to the words "for prescribing and defining the duties, and limiting the powers of *such* corporations when *so* organized? Do the words, "such corporations when so organized," mean railroad corporations hereafter organized, under the provisions of this act, or does it mean "railroad corporations organized in a manner similar to the corporations whose organization is provided for in this act?" It seems to me that the last meaning can be given to these words, without doing any violence to the language used, and that it is our duty to give it this meaning, under the liberal rule of interpretation which we have seen should be applied in such cases, as by so doing, the title will correctly describe the contents of the act. The word "such," according to Worcester, means of "that kind, or the like kind," and the word "so" means in "like manner." "Such corporation, when so organized," then, means, "corporations of a like kind, when organized in a like manner." And were not the then existing railroad companies "corporations of a like kind" with those whose organization was provided for by this act; and were they not "organized in a like or similar manner?" They may not be organized in the same manner, but they are "organized in a like manner."

I think, therefore, that the second clause of the title, when interpreted in the manner we have seen it should be interpreted, may fairly be considered as announcing that the provisions of the act extended to all railroad companies, for they are all "corporations of a like kind and organized in a like manner." There is in this act but one general object, to make regulations in reference to all railroad companies, and there is no incongruity in applying them to all, whether theretofore or thereafter incorporated.

This act, if it has an appropriate title, does not violate the provision of the Constitution requiring every act to embrace but one object, for the true meaning of the Constitution is one general object; and in one act there may, constitutionally, be embraced all matters which are not incongruous with each other, and which by fair intendment, can be considered as having a necessary or proper connection. This position is sustained by many of the above authorities, and others.

It is insisted, however, that, even if this act applies to existing railroad companies, that it ought not to be construed as applying to a case when an existing railroad company had *taken* the lands under the provisions of the Code, before the passage of the Constitution, or the passage of this act. If the railroad company had acquired a complete title to the land, before the adoption of the Constitution, or the passage of the act, it is obvious that neither the constitutional provision allowing either party to have a jury, nor the similar provision in the act, could be applied to such a case. But when, as in this case, the *taking* of the land amounts only, to a right to hold possession thereof during the pendency of the controversy, and does not amount to the acquisition of a title to the land, there is no reason why the eighteenth section of chapter 88, of acts of 1872–73, which defines how "A railroad corporation may acquire title to lands," should not apply to all cases where such title has not been already acquired. This section effects only the

83

remedy, that is, it prescribes the manner of proceedings to be resorted to, in order that a railroad company may acquire title to land, and when a new law changes such remedy, pending proceedings, the general rule is that the proceedings thereafter, and judgment, must conform to the new law. *Jacquins v. The Commonwealth,* 9 Cush, 279 ; *Bickford v. The Boston and Lowell Railroad Corporation,* 21 Pick., 109 ; *Yeaton v. United States,* 5 Cranch 281; 2 Curtis 263.

*The next assignment of error,* is that the record should, affirmatively, show, that the jury was composed of twelve freeholders, which it not only does not do, but it is insisted that it does not even appear that the sheriff was directed to summon freeholders as jurors. It may, I think, be fairly inferred from what the record does state, that the sheriff was directed to summon as jurors, freeholders. For the record shows, that the defendant filed written exceptions to the report, and, in them, he expressly "required the compensation to which he is entitled, shall be ascertained by an impartial jury of twelve freeholders, in pursuance of the Constitution and laws of West Virginia." The court acted on these exceptions, and on the defendants motions "to have a jury empannelled to ascertain the damages to which he is entitled, as prescribed by section 18, of ch. 88, of the acts of 1872–73," and this section provides for a jury of twelve freeholders. The plaintiff objected to this motion, but the court sustained the motion, and ordered "that a jury be empannelled to ascertain and report what sum shall be a just and equitable compensation for the land taken by the plaintiff, and described in the proceedings." And, subsequently, it is stated, on the record, that "the jury came, (to the empanelling of which the plaintiff objected, but his objection was overruled,) and the jury, naming them, being elected, tried, and sworn, well and truly to assess the defendant's damages, found a verdict.

As I understand the record, a jury of freeholders was directed to be summoned. The plaintiff objected, not

only to the summoning of a jury, but, when they were returned, to their being empanneled—but not, as I understand the record, because they were not freeholders, but because it was improper either to summon, or empannel any jury in the case. It is true that the record does not, affirmatively, show that the jury, who were sworn, were freeholders, unless, it can be properly inferred from the fact that freeholders, as I understand the record, were directed to be summoned, and the record does not show that they were objected to when empanneled, because they were not freeholders. It is insisted, that in all proceedings, in derogation of private rights, the jurisdiction and regularity of the proceedings, must be manifested on the face of the record, and no omission can be supplied by presumption; and that it was absolutely necessary, that these proceedings might be valid, that the record should show, positively and directly, that the jurors were freeholders. To sustain this position, the cases of *The People ex rel, Bingham v. Brighton*, 20 Michigan, 57; *Nichols v. Bridgeport*, 23 Conn., 190, and *Farmington v. Morgan*, 20 Wend,, 207; are relied upon.

The first of these cases, was a proceeding by the village of Brighton to lay out a street through Bingham's land. By the statute law of Michigan, a justice of the peace is required, at the instance of the town, to issue a writ directing a jury to be summoned of twelve freeholders, residing without the limits of the town, to determine, both the necessity of the street, and the compensation to be allowed. The justice has no supervision or control, of any sort, of the jury in the trial of the case; but is simply required to render a judgment according to the verdict of the jury. The writ in that case was properly issued; but the sheriff's return simply states that he had summoned twelve jurors, without stating that they were non-residents of Brighton, or were freeholders. The court say " that there is no one authorized, under the statute, to rectify any mistakes of the Sheriff.

The parties must depend on his official certificate in the first place, and have no means of correcting the pannel. The regularity of the record depends upon its appearing, by it, that the jurors were freeholders and non-residents. Such a *jurisdictional requisite* cannot be supplied or overlooked. At the instance of the land owner, these proceedings were quashed. So in the case of *Nichols v. Bridgeport*, 23 Conn., 190. The Mayor of Bridgeport, by its charter, was authorized to appoint three disinterested freeholders of the city, to estimate the damages resulting from opening a street, whose report, when returned, was to be recorded, and on paying the damages so assessed, the street might be opened. The land holder, if dissatisfied, having a limited time to have a new assessment in a certain manner. The court decided "that the fact that the persons whom the mayor was bound to appoint, was a *jurisdictional fact,* which could only be shown by the appointment itself, or the record of it." These decisions were both on the ground that the jury alone, in the one case, and the appraisers, in the other, were the only tribunals authorized to assess the damages, and that it must appear, by the record itself, that this tribunal was a legal tribunal; that is, were freeholders.

The case of *Farmington v. Morgan*, 20 Wend. 207, was a proceeding had before a justice against a tenant, holding over after the expiration of his term. The statute required the justice, in order to form a jury to try the matter, "to nominate eighteen respectable persons, qualified to serve as jurors in a court of record," who were to be summoned, and twelve of them balloted for as a jury. The justice issued a *venire*, directed to a constable, " to summon a jury as directed by the statute." The constable summoned twenty jurors. The tenant objected to the pannel; his objection was overruled, and a jury of twelve, drawn from the twenty summoned, were empannelled, and they found a verdict for the landlord. The court reversed the proceedings. The court, in its opinion, say: " The error of summoning twenty, in-

1876.
August Term.

C. & O. R. R.;
v.
Patton.

stead of eighteen, jurors, would be fatal in any court, on objection being taken. It would be a good cause of challenge to the array. But, above all, in this summary proceeding, it should appear expressly that eighteen nominees of the magistrate formed the jury of ballot, and and that twelve of the eighteen, they being all summoned, formed the jury of trial." The general language of the court, "that summary proceedings are, in general open to objections for technical omissions, imperfections, or: defects in the return," should be considered as applying. to such a case as was before the court, a proceeding before a single justice, and not before a court of record of general jurisdiction. The rule, as I understand it, is, that superior courts are presumed to act by right, and not by wrong, and their acts and judgments are, consequently, conclusive in themselves, unless plainly beyond the juris- diction of the tribunals whence they emanate. . But the jurisdiction of limited and inferior tribunals cannot be presumed, but must be shown affirmatively, to confer validity on their acts. Smith's leading cases, note. to *Crepps v. Durden & Co.*, vol. 1, page 816, fifth American from last English edition, side page 387, n.; *Cox v. Thomas' admx.* 9 Gratt. 323. The above decisions, relied on by the appellant, are entirely consistent with these principles. The maxim, "*omnia rite acta*," applies to all courts of general jurisdiction, and therefore to the circuit court of Kanawha. And the jury empannelled in this case, must be regarded as a jury of freeholders, unless the contrary appears. The defendant did not object to any juror, when he was sworn, because he was not a free- holder, the only objection made by him being to the em- pannelling of any jury. And it must, upon the general principle above laid down, be presumed that the jury were all freeholders. And though, after the verdict was rendered, a motion for a new trial was based on an affi- davit that seven of the jury were not freeholders, but it not appearing from this affidavit, that the plaintiff did not, when the jury was sworn, have knowledge of this

fact, this objection comes too late after verdict. This proposition seems to me so clear as not to need the citation of authorities to sustain it, for, otherwise, the plaintiff, knowing that one of the jury was not a qualified juror, could take his chances of getting a verdict to suit him, and if he failed, have a new trial at his option.

It is also insisted, in argument, that the proper oath was not administered to the jury, and the verdict did not show that the jury had decided all that should have been considered and decided by them. The statute prescribes no form of oath, nor of the verdict. The oath, in this case, was, "well and truly to assess the defendant's damages," and the verdict was, "we, the jury, find for the defendants, and ascertain and determine the amount to be paid by the Chesapeake & Ohio Railroad Company to Robert Patton, for a strip of land, described in the proceedings, and bounded as follows, to wit: (giving the boundaries), to be the sum of $2,159.55½." From this oath and verdict, together, it appears that the plaintiff could not have been prejudiced by the matter submitted to, and considered by, the jury.

The only remaining assignment of error is, that the jury were guilty of misconduct in their mode of ascertaining the amount for which they rendered a verdict, in this, that they agreed that each juror should put down the amount he regarded as the true amount, and that the aggregate of these amounts should be divided by twelve, which sum was to be the amount of the verdict; and that the amount of the verdict was so ascertained. I cannot, in this case, consider whether this is such misconduct in the jury as to justify the setting aside of their verdict. Misconduct in a jury must be shown by other evidence than the oath of a juror. *Vasie v. Deleval*, 1 T. R. 11; *State v. Freeman*, 5 Conn. R. 348; *Johnson v. Davenport*, 3 J. J. Marsh R. 390. The authorities, generally, on the admissibility of an affidavit of a juror to impeach their verdict, are considered and reviewed at considerable length by Judge Moncure, in Bull's case, 14 Gratt. 613;

1876.
August Term.

C. & O. R. R.
v.
Patton.

and the conclusion arrived at is, that, as a general rule, the testimony of jurors ought not to be received to impeach their verdict, especially on the ground of their own misconduct. We need not now decide whether there are any exceptions to this general rule. But the authorities cited in Bull's case, justify us in saying that there are no exceptions to this general rule, when the affidavit of the juror is to impeach a verdict on account of the *misconduct* of a juror, or of the jury.

It is further insisted by the appellant, that the judgment should not have been entered up for the amount of the verdict, but that the court should, before entering up judgment, have given a credit for the $675 paid into the court by the appellant on September 14, 1870. The proper time to allow this credit is, when it is paid to the appellee. It has not yet, so far as the record shows, been received by him. And full justice can be rendered to the appellant by the circuit court, by compelling this credit to be allowed at the proper time, if it should not be voluntarily done by the appellee.

There being then no error in the record prejudicial to the appellant, the judgment of the circuit court must be affirmed, and the appellee must recover of the appellant his costs in this court expended, and damages according to law.

The other judges concurred.

JUDGMENT AFFIRMED.