VIOLET MILLER *v.* THE BLUE RIDGE TRANSPORTATION CO., *a corporation, et al.*

(No. 9157)

Submitted April 29, 1941.   Decided June 10, 1941.

*Terence D. Stewart* and *Ezra E. Hamstead,* for plaintiff in error.

*Alfred R. Putnam* and *L. T. Eddy,* for defendant in error.

RILEY, JUDGE:

The plaintiff, Violet Miller, instituted this action in the Circuit Court of Marion County against the Blue Ridge Transportation Company, a corporation, White Star Lines, Inc., and Penn Bus Company, a corporation, comprising and doing business under the trade name of, "Blue Ridge Lines", to recover damages for alleged personal injuries sustained while a passenger on a motor bus operated for hire by defendants between Pittsburgh, Pennsylvania, and Fairmont, West Virginia. To a judgment in the

amount of $7,725.00, entered on a jury verdict in plaintiff's favor, defendants prosecute this writ of error.

The declaration alleges, in substance, that the defendant corporations comprise, and do business under the trade name of, "Blue Ridge Lines"; that on February 25, 1940, and for a long time prior thereto, defendants were the owners and operators of certain motor busses for hire from Pittsburgh, Pennsylvania, through Morgantown to Fairmont, West Virginia; that on said day, plaintiff became a passenger for hire on one of defendants' busses for the purpose of being carried from Pittsburgh to Fairmont; that the defendants negligently and carelessly operated the bus, in which plaintiff was riding, at an excessive rate of speed, to-wit, at fifty miles per hour, over an uneven, rough and bumpy portion of, or break in, the highway, thereby causing said bus to lurch and jump in such a violent manner that plaintiff "was thrown from her seat and against the seats in front of her and against the sides of said bus," and that as a result of said negligent operation of the bus plaintiff was painfully and permanently injured, prevented from performing her usual occupation as a housekeeper for about six weeks, and caused to suffer an abortion or miscarriage and expend sums of money in an endeavor to regain her health.

On the morning of the day of the alleged injury, plaintiff and a companion, a Mrs. Coleman, purchased round-trip tickets to Pittsburgh. These tickets, according to the legend thereon, were issued by "Blue Ridge Lines comprising" the several corporate defendants. The bus, which they entered at Fairmont at 9:10 a. m., had painted on its sides "Blue Ridge Lines", and in smaller letters "White Star Lines". At 7:30 p. m., after a day in Pittsburgh, plaintiff and her companion boarded the same type of bus, returning, however, by a different route, through Uniontown, Pennsylvania, to Morgantown, and thence south through Rivesville to Fairmont. At Uniontown, one W. D. Ridgeley, known to Mrs. Coleman but not to plaintiff, got on the bus as a passenger.

To the south of Rivesville, according to plaintiff's evidence, there is a "bump" or sharp break, a "drop off

of the concrete" extending across the highway and dipping toward Fairmont, due to an old slide. It is at this point that plaintiff claims to have received the injury upon which the instant action is based.

Plaintiff's witnesses testified that the bus was running at a speed of forty-five to fifty miles per hour at the time it struck the broken portion of the road; that the approach to this place was over smooth concrete for more than a half mile; that it was late at night and there was nothing to call the attention of the passengers to any impending peril or danger; and that as the bus went over the "bump" or break it was caused to lurch to the left and then to the right, throwing plaintiff with force against the back of the seat in front of her and then sideways. Plaintiff was sitting to the right of the center of the rear seat, which extended across the entire width of the bus. Mrs. Coleman was seated next to her, and Ridegeley occupied the seat to the left of the aisle and directly in front of the rear seat. Plaintiff testified that she immediately experience a "catch", in the lower part of her back and leg, and the next day pain in her stomach. Both Mrs. Coleman and Ridgeley testified plaintiff held herself across the abdomen and back, and complained. When the bus arrived in Fairmont, Mrs. Coleman protested to the driver against the way he operated the bus. She testified further that plaintiff stumbled and appeared to be "in a faint" after alighting from the bus, and the driver inquired if plaintiff desired the services of a physician. Plaintiff then accompanied Mrs. Coleman to the latter's home, a short distance away, and shortly thereafter, took a taxicab home, where, her husband says, he assisted her into the house.

Mrs. Coleman visited plaintiff on the afternoon following the Pittsburgh trip, and remained with her that night and every night thereafter for about a month. On the day of her first visit, Mrs. Coleman accompanied plaintiff to the office of Dr. Paul Yost who had been plaintiff's physician from about 1935 until 1938, and during that period had treated her for female disorders. Dr. Yost testified that plaintiff complained of her back and stated

she thought she had had a miscarriage; that he made only cursory examination. This doctor stated that, because of the condition for which he had formerly treated plaintiff, she was unable to have a child.

Dr. Keister of Fairmont testified that on February 27, 1940, he was called to plaintiff's home, where he found plaintiff in bed, having uterus bleeding and paroxysmal cramps. From his examination on that occasion and the history which he obtained from plaintiff he was of opinion that plaintiff was threatened with an abortion, which he described as an interruption of pregnancy at any time from conception to the end of three months. He further testified that he made no examination of plaintiff on the occasion of his first visit because of the danger of infection; that the next morning he received a telephone call to the effect that plaintiff was unable to come to his office, as he had requested; and that he then visited plaintiff at her home, made a vaginal examination, noticed bleeding, softness of the cervix, which he said was indicative of pregnancy. Thereafter, he treated her every few days until some time after March 20, 1940; that on March 21, 1940, he was again called to plaintiff's home, made an examination, found the mouth of the womb open and bleeding, and noticed an unusual odor, which witness stated led him to believe that a dead foetus had been expelled. His opinion that plaintiff had lost a foetus was based upon the fact that on his second visit he found plaintiff's uterus enlarged, soft and bleeding, and that on March 21, 1940, following the alleged abortion, the uterus had materially reduced in size and there was an odor of decomposed tissue.

Both plaintiff and Mrs. Coleman testified that on March 20, 1940, plaintiff's illness became acute, and about nine o'clock in the evening, she was delivered of a foetus, which looked like a piece of meat, being about three inches long and one-half inch wide; that Dr. Keister was called but was not available; and that Mrs. Coleman disposed of the foetus shortly thereafter.

In contradiction of Dr. Yost's statement that, because of plaintiff's condition, she was unable to have a child, plaintiff and her husband testified that a child, Doris Jean

Miller, was born to them in 1936 at Fairmont. They stated that this child died in 1938 at the home of Mrs. Miller's father in Jefferson County, Pennsylvania, and was buried there. However, this evidence is clearly rebutted by the testimony of the county clerk of Marion County, West Virginia, the custodian of vital statistics in Jefferson County, Pennsylvania, the secretary and manager of the cemetery in which the child is supposed to have been buried, and, in particular, by the testimony of Dr. Yost, who testified he treated the plaintiff a short time before plaintiff claimed the child was born, and that plaintiff at that time was not pregnant.

In support of their position that the trial court should have granted their motion to set aside the verdict and grant a new trial, defendants assign a number of grounds of error. For convenience, they will be discussed seriatim as they appear in the briefs.

In the first place, they contend that plaintiff's declaration and the proof in support do not establish a joint liability against defendants. Reliance is had upon *Farley* v. *Crystal Coal & Coke Co.,* Pt. 2, Syl., 85 W. Va. 595, 102 S. E. 265, 9 A. L. R. 933. In that case, however, a plaintiff riparian owner undertook to establish joint tort liability against a number of defendant coal companies based upon their wholly independent action without concert, collusion or common design in polluting a stream passing through his property. The instant declaration and record disclose that defendant corporations were engaged in the joint enterprise of operating busses for hire. The ticket which Mrs. Miller claims was sold to her showed that the three defendant corporations were doing business under a common trade name. The bus itself was labelled with that trade name, and though the particular bus may have belonged to the defendant, White Star Lines, Inc., there is nothing in this record to off-set the evidence that the three corporations were engaged in the common enterprise of maintaining the bus mentioned here, together with other busses for the transportation of passengers for hire. Under the circumstances we think defendants' first

assignment of error does not prompt a reversal of the trial court's judgment.

Defendants say that plaintiff's evidence is not worthy of belief, and that courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible. They rely in particular upon the decisions in the case of *Marshall* v. *Conrad*, 118 W. Va. 321, 191 S. E. 553, and *Acree* v. *Eureka Pipe Line Co.,* 122 W. Va. 242, 8 S. E. (2d) 186. In support of this position, they rely upon the testimony of certain of their witnesses, passengers on the bus, relative to the manner in which the bus was operated, and what transpired thereon; the testimony of Dr. Yost on the question of plaintiff's ability to have a child; and the apparent incredible testimony of plaintiff and her husband as to the birth, death and burial of their claimed child, Doris Jean Miller. The evidence of the first group of witnesses does not justify this Court in saying as a matter of law that plaintiff did not suffer injuries on the bus. At the most, this testimony, coupled with that of plaintiff, Mrs. Coleman and Ridgeley, presents such a conflict that unless the plaintiff is discredited in other particulars bearing directly upon the question of liability, the verdict of the jury should not be disturbed. Likewise, the testimony of Dr. Yost to the effect that plaintiff was incapable of pregnancy should not override, as a matter of law, Dr. Keister's testimony and prompt us to disturb the jury's verdict on this issue. Dr. Keister actually examined and treated the plaintiff during the time of her claimed pregnancy and abortion. His qualification as a witness is admitted of record by defendants' counsel. In addition to the history which plaintiff gave him, his opinion is based on plaintiff's physical condition as he found it during the period he treated her from two days after her alleged injuries until several days after the claimed abortion. Under the circumstances, we think the jury had a right to take as true Dr. Keister's testimony and disregard the opinion testimony of the two other physicians so far as that testimony deals with the issue whether plaintiff actually had an abortion on March 20, 1940.

But defendants' counsel say that plaintiff was wholly discredited in her testimony concerning the birth and death of Doris Jean Miller, and being discredited in this particular her whole testimony should be disregarded. The *Acree* and *Marshall* cases, however, are not in point. In the latter case the testimony of plaintiff's witnesses as to the position of the cars on the road and the circumstances under which the accident occurred, were so incredible that this Court held there was no actionable negligence. In the *Acree* case, this Court held that Mrs. Acree's story of how she incurred her claimed injuries was contradicted to such an extent by the physical facts that her testimony was incredible to the judicial mind. The evidence on behalf of plaintiffs in both of these cases went directly to the question of liability. Though the testimony as to Doris Jean Miller was worthy of little or no credence, the truth or falsity of plaintiff's position as to that claimed fact, bears only on the question whether plaintiff, as suggested by Dr. Yost, could not become pregnant. We cannot say, with the instant record before us, that plaintiff's evidence concerning Doris Jean Miller involves a controlling point in the case. It follows its incredibility would not have justified the circuit court in setting aside the verdict. Points 2 and 3, Syl., *Denoff* v. *Fama,* 102 W. Va. 494, 135 S. E. 578:

> "A verdict of a jury should not be set aside on the ground of insufficient evidence, where the sufficiency depends upon the credibility of witnesses and the reasonable inferences which may be drawn from the evidence.
> "Where the evidence on a controlling point in a case is so conflicting that his court would not be justified in saying that the verdict is so plainly against the decided weight and preponderance of conflicting evidence as to make the rendition of the verdict palpably unjust, the verdict will not be set aside as being contrary to the law and the evidence."

Moreover, the credibility of witnesses and the weight of evidence are peculiarly within the province of the jury.

Though a witness may have testified falsely in some particulars as to a matter not controlling, that does not permit a court to withdraw completely the testimony from jury consideration. *State* v. *Hackle,* 110 W. Va. 485, 158 S. E. 708.

Defendants further assign error to the refusal of the trial court to give their instructions numbers seventeen and nineteen. We need not, however, approve or disapprove these instructions. They are fully covered by defendants' instructions numbers fifteen and sixteen, which were given.

Error is further assigned on the ground that the plaintiff was guilty of contributory negligence. *Peters* v. *Monongahela Transport Company,* 109 W. Va. 417, 155 S. E. 178, is cited. Plaintiff therein was riding on a bus in a relaxed position in which he remained, though in plain view an automobile was seen two or three hundred feet away veering from one side of the road to the other. Plaintiff here was also in a relaxed position. But she was sitting in the rear of the bus a number of seats behind the driver; the night was dark and she had been travelling a long distance. Naturally, she placed herself in what she thought was a comfortable position and became relaxed in so doing. She testified that as she approached the place of her alleged injuries, she did not do anything to protect herself, because "she did not have time to * * * did not know what was going to happen." In this jurisdiction, a passenger in an automobile must exercise reasonable care for his own safety, but he is not required to "be constantly at the height of attention and alertness * * *." *Darling* v. *Browning,* 120 W. Va. 666, 200 S. E. 737. *A fortiori,* a passenger for hire seated in the rear of a bus is under no duty to look constantly toward the front and ahead of the driver and make protests to the driver which will be annoying both to the driver and the other passengers. Under the circumstances, we think it was clearly within the province of the jury to determine whether plaintiff's conduct was contributory negligence. Contributory negligence is ordinarily a question for the jury. *Sewell* v. *Lawson,* 115 W. Va. 527, 177 S. E. 293; *Redmond*

v. *Greater Fairmont Bakery,* 114 W. Va. 132, 171 S. E. 109; *Menafee* v. *Monongahela Ry. Co.,* 107 W. Va. 245, 148 S. E. 109. And the burden of its proof rests on the party asserting it. *Koon* v. *Monongahela West Penn Public Service Co.,* 119 W. Va. 76, 192 S. E. 332; *Marshall* v. *Conrad, supra; Peters* v. *Monongahela Transport Co., supra; Virginia & S. W. Co.* v. *Skinner,* 119 Va. 843, 89 S. E. 887; *Fisher* v. *West Virginia & P. R. Co.,* 39 W. Va. 366, 19 S. E. 578, 23 L. R. A. 758, Huddy on Automobiles, 5th Ed., Secs. 688, 689, 690, and 716.

Error is further assigned to the refusal of the trial court to inquire of the jury, upon defendants' motion, if the verdict was a "quotient verdict." The quotient verdict implies an agreement in advance among the jurors that each shall put down the amount which he thinks the verdict should be, and the aggregate of said sums is then divided by twelve. *Washington Luna Park Co.* v. *Goodrich,* 110 Va. 692, 66 S. E. 977. Of course, if jurors, previous to their verdict, agree to a particular mode of arriving at it and to abide by the result, and thus relinquish the liberty of dissenting, such proceeding would be improper. But if the jury simply adopt a means for arriving at the amount of damages without binding themselves by the result, their verdict is not objectionable. 27 R. C. L., Verdict, Section 21, cases cited under Note 11. The difficulty with defendants' position lies in a rule of public policy which has governed the conduct of jury trials in both Virginia and West Virginia. Time and again it has been held that affidavits of a juror should not be received to impeach a verdict. *Bull* v. *The Commonwealth,* 14 Gratt. 613; *Pickens* v. *Coal River Boom & Timber Co.,* 58 W. Va. 11, Pt. 5, Syl., 50 S. E. 872, 6 Ann. Cas. 285; *Graziani* v. *Fimple,* 110 W. Va. 383, 386, 158 S. E. 658; *Reynolds* v. *Tompkins,* 23 W. Va. 229, Pt. 37, Syl. In *Chesapeake & Co.* v. *Patton,* 9 W. Va. 648, Pt. 6, Syl., the practice of receiving the affidavit of a juror that the verdict was obtained by a quotient method was expressly condemned. If the affidavit of a juror, voluntarily given, is not permissible for the purpose of impeaching a verdict, a trial court should not inquire of a jury as to the method used

in obtaining the verdict. The same public policy prevails in either instance. The only proper inquiry is whether the verdict is, in fact, the verdict of the jury. For this purpose the trial court may, as it offered to do in this case, poll each member of the jury on the question of whether the verdict rendered is the verdict of each juror.

Finally defendants assign error to the refusal of the trial court to set aside the verdict on the ground that it is excessive. Though the declaration alleges that plaintiff has suffered permanent injuries, the evidence introduced to sustain that allegation is meager indeed. In fact, we think that on the question of permanent injuries, there is a clear preponderance of the evidence in defendants' favor. Mrs. Miller herself testified that since March 21, 1940, she has been nervous but otherwise all right; that she does not sleep as well as she did before her alleged injuries; and that she does not think her female organs have been affected by the alleged abortion. The medical evidence by no means supports any theory of permanent injuries. Plaintiff's own physician, Dr. Keister, testified that after March 21, 1940, she improved rapidly; and that from the treatment and his experience in this case, he was of the opinion she would make a complete recovery. Dr. Ramage examined plaintiff about April 9, 1940, at Dr. Keister's office and in his presence, and found that plaintiff was in a normal condition. He testified that abortions or miscarriages seldom produce any permanent effects. Under the circumstances we do not think that the jury here was justified in including any amount for permanent injuries. Whether the verdict includes an item for permanent injuries, the record does not disclose. Our attention has been invited to no West Virginia case sustaining a verdict in the amount of the instant verdict where, as here, the plaintiff suffered an abortion after a claimed pregnancy of two and a half months, with no serious permanent effects. In *Malone* v. *Monongahela Valley Traction Co.*, 104 W. Va. 417, 140 S. E. 340, plaintiff obtained a verdict based upon the miscarriage of a seven-months foetus. This verdict was set aside because an instruction was so framed as to permit the jury to find

damages for mental anguish and suffering because of the loss of plaintiff's child. In *Lambert* v. *Brewster*, 97 W. Va. 124, 125 S. E. 244, the plaintiff recovered a verdict for $500.00, based upon an abortion when the foetus was two months old. The trial court set aside the verdict and this Court reinstated it. This Court in *Hodge* v. *Charleston Interurban R. Co.*, 79 W. Va. 174, 90 S. E. 601, sustained a verdict for $4,000.00, in an action for personal injuries which caused a miscarriage and subsequent uterine deformity and disease, seriously impairing plaintiff's general health and making a surgical operation necessary. These West Virginia cases do not sustain plaintiff's position that the verdict is not excessive. While no exhaustive examination of cases has been made, we have examined many cases in other jurisdictions and have not found a single case involving an abortion or miscarriage, unaccompanied by permanent injuries, sustaining a verdict in the amount of the one here. For a general collation of authorities see 15 Am. Jur., Damages, Section 225; 1 Parmele, Damage Verdicts, (1927) 1044-1051; and see also notes to the following cases: *Williams* v. *Fleming* (Mo.), 284 S. W. 794, 46 A. L. R. 1220, Notes 1398, 1399; *Berg* v. *Griffiths*, 127 Neb. 501, 257 N. W. 44, 102 A. L. R. 1127, Notes 1515, 1516.

Under the circumstances we think the verdict is excessive. So, for this reason alone, the verdict of the jury is set aside, the judgment of the circuit court reversed and a new trial awarded.

*Verdict set aside; judgment reversed; new trial awarded.*